United States District Court
Southern District of Texas
**ENTERED**
March 19, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Antwanne Lee, | § § § | |
| *Plaintiff,* | § § | |
| | § | Civil Action No. 4:23-cv-01470 |
| v. | § § | |
| Olivia Brokenberry and Harris County, | § § | |
| | § § | |
| *Defendants.* | § | |

## MEMORANDUM AND ORDER

Defendant Olivia Brokenberry, the sole remaining defendant in this case, Dkt. 38, has filed a motion for summary judgment on Plaintiff Antwanne Lee's claims. Dkt. 47, 48. After carefully considering the motion, Lee's response, Dkt. 49, 50, Brokenberry's reply, Dkt. 53, and the applicable law, the Court concludes that Brokenberry's motion for summary judgment (Dkt. 47) should be granted.

## Background

On November 29, 2021, Lee was detained at the Harris County Jail awaiting trial. Dkt. 50-4 at 1 (Lee's affidavit); Dkt. 47-3 at 14, 34 (Lee's deposition). That day, Brokenberry was stationed in the "picket," an observation room where detention officers watched the cells. *See* Dkt. 50-3 at 15-16 (Lee's description of the picket). The picket has one-way mirrored glass:

 

Dkt. 56-1 at 11, 16.

The first floor of the cell block has a common area with tables, toilets along the left wall, bunks against the back wall, and stairs on the right that ascend to a loft-like area with more bunk beds.



Dkt. 56-1 at 20.  Inside the picket, a detention officer can see the bunk beds against the back wall of the second floor, but they are far away.



Dkt. 56-1 at 5; *see also* Dkt. 57 (Brokenberry's videos nos. 1 & 2 from inside the picket, and no. 3 from the second floor).

Upon arriving at the cell block, Lee allegedly saw "two inmates shake their head[s] like don't come in here." Dkt. 47-3 at 37. Lee told Brokenberry that he was "in fear of [his] life." *Id.* at 63. When Brokenberry directed him to enter the cell anyway, Lee decided that he would masturbate in front of her, believing that this tactic would prompt her to move him elsewhere. *See id.* at 61-63; *see also id.* at 49 (Lee explaining that he decided to do this as a "disrespectful" act toward Brokenberry).

Lee sat on the top bunk against the back wall with a white sheet draped around his shoulders and a mask on his face.[1]  *Compare* Dkt. 47-4 at 00:41-24:59 (DX-4, timestamp 17:06:39, Lee's appearance in the upstairs area and climbing onto the top bunk, remaining there until he climbs down around 17:30:57), *with* Dkt. 56-1 at 18-19 (view of the picket from the farthest bunk). Lee's bunk was opposite the top of the stairs, farthest from the picket, and parallel to a door on the second floor:



Dkt. 47-4 at 1:00 (timestamp 17:06:58).   Through the second-floor door, inmates could communicate with other inmates in the adjoining cell block. Dkt. 61-12 at 27 (Brokenberry's deposition).

---

[1] This event occurred during the COVID-19 pandemic.  That is why Lee was wearing a mask.  *See, e.g.*, Dkt. 47-3 at 99, 132 (discussing Lee's and a detention officer's "COVID mask[s]").

Lee masturbated intermittently while seated on the bunk. *See, e.g.*, Dkt. 47-3 at 108, 110-13. Speaking over the intercom, Brokenberry ordered Lee to stop masturbating. *See* Dkt. 47-3 at 92 (alleging that Brokenberry said, "Lee, I know you ain't nutting on that boy's bed, you nasty mother f*cker"); *see also* Dkt. 47-2 at 3, 5 (Brokenberry recalling that she instructed Lee to stop masturbating, admitting that she probably called him a "mother f*cker" when doing so). According to Lee, he responded to Brokenberry that he was not "jacking off on her anymore." Dkt. 47-3 at 92.

At some point before or after that exchange, an inmate ran upstairs to the door on the second floor and communicated with someone on the other side of the door. *See* Dkt. 47-4 at 6:44-7:27 (timestamp 17:12:42 to 17:13:26). According to Lee, that inmate told the other person, "[W]e fixing to roll that n*gga, we fixing to roll them." Dkt. 47-3 at 110-11. Eventually, more inmates came and went from the second floor, with a few lingering by and appearing to speak with someone through the door. *See* Dkt. 47-4 at 14:00-15:04 (timestamp 17:19:58 to 17:21:02). Lee claims he told those other inmates that he was "jacking off on the ho," Dkt. 47-3 at 116 (asserting this exchange happened between 15:02 to 15:21 of the video), but the video confirms that Lee did not interact with those inmates. *See* Dkt. 47-4 at 15:02-15:21.

At about 5:22 p.m., while Lee remained seated on the bunk bed, an inmate descended partway down the stairs and turned toward the picket. *See*

Dkt. 47-6 at 00:46-52 (DX-5A, first floor video, timestamp 17:22:47 to :53); *see also* Dkt. 47-3 at 140-42.   Neither his hands nor his face are visible on the video.  *See* Dkt. 47-6 at 00:46-52.  But Lee claims that the inmate looked toward Brokenberry in the picket, asking "Do you want me to roll him?" while making a circular gesture with his hands.  Dkt. 47-3 at 142-43, 147; Dkt. 47-6 at 00:46-52.  According to Lee, Brokenberry responded by saying "Hurry up, I'm fixing to get off work."  Dkt. 47-3 at 143.  Lee did not hear either speaker say those things.  *See* Dkt. 47-1 at 3; Dkt. 47-3 at 95-96.  Instead, Lee claimed that he read both speakers' lips.  *See* Dkt. 47-1 at 3; Dkt. 47-3 at 54, 95-96.

The inmate who allegedly made the gesture continued down the stairs, where many other inmates were located on the first floor.  *See* Dkt. 47-6 at 00:52-57 (timestamp 17:22:52 to :57).   Despite Lee's assertions he was "immediately assaulted," Dkt. 61 at 10, the video shows that the inmates milled around for the next 9 or 10 minutes.  Several inmates played cards or were gathered around a back table.  *See* Dkt. 47-6 at 1:31-3:30 (timestamp 17:23:32 to 17:25:30).  A few donned masks: one intermittently pulled the mask down around his chin, *see id.* at 1:30-1:54 (timestamp 17:23:31 to :54), another had a mask on his face, and a third, on top of his head.  *See id.* at 1:40-1:52.

The inmate who initially placed the mask on the back of his head set the mask on a table, took off his shirt, unspooled bundles of toilet paper, and went toward the restrooms on the left side of the cell block.  *See id.* at 1:54-3:08

6

(timestamp 17:23:54 to 17:25:09). Another inmate came downstairs with a shirt tied around his face like a makeshift mask. *See id.* at 3:10-:14 (timestamp 17:25:11 to :15); *see also* Dkt. 47-4 at 19:03-:06 (timestamp 17:25:01 to :04) (same inmate grabbing t-shirt from a second-floor bunk).

Inmates also moved between the first and second floors. *See* Dkt. 47-4 at 14:00-17:26, 19:02-:21, 19:38-22:41 (timestamp range from 17:19:57 to 17:28:39); *see also* Dkt. 47-6 at 2:37-:59 (inmates ascending the stairs, 17:24:37 to 17:25:00). Some inmates went to their bunks to retrieve possessions, while others appeared to communicate with inmates through the second-floor door. Dkt. 47-4 at 13:59-16:47 (timestamp 17:19:57 to 17:22:45). During this period, the inmate who allegedly made the gesture earlier went upstairs and grabbed a towel off a bunk. Dkt. 47-6 at 2:48-:57 (first-floor video, timestamp 17:24:49 to :59); Dkt. 47-4 at 19:05-:21 (second-floor video, timestamp 17:25:03 to :19). He came downstairs and wandered toward the back of the cell block, draping the towel over the back of his head and tying it like a do-rag. *See* Dkt. 47-6 at 3:21-:46 (timestamp 17:25:22 to :46).

While on the first floor, the same inmate picked up a mop from a bucket and appeared to unscrew the head before walking away. *See id.* at 5:05-:23 (17:27:05 to :23). Several other inmates congregated briefly on the stairs. *See id.* at 6:42-7:22 (17:28:43 to 17:29:23). At the back table, the inmate who had allegedly made the gesture tied his shoes. *See id.* at 7:44-8:01 (timestamp

17:29:45 to 17:30:02). Yet another inmate played briefly with the mop, moving it up and down in the bucket, with the mophead still attached, before setting it against a wall. *See id.* 9:02-9:22 (timestamp 17:31:03 to :22). Under the television screen, an inmate used the "hot pot" allegedly to heat water. *See* Dkt. 61-12 at 28 (Brokenberry's testimony describing this footage); Dkt. 47-6 at 9:10-:18 (timestamp 17:31:10 to :19, inmate with towel/t-shirt on his head reaching down and tinkering with a device on the floor under the television).

According to Lee, he went downstairs after hearing a voice declare that they were going to "roll" someone. *See* Dkt. 47-3 at 151-53. Lee walked to the first floor and went to use the restroom. Dkt. 47-6 at 9:21-:39 (timestamp 17:31:21 to :39); Dkt. 47-3 at 158. At that time, most of the inmates appeared to be hanging around near the back of the first floor, closer to the bunk beds, much as they were before Lee appeared downstairs. *Compare, e.g.*, Dkt. 47-6 at 8:11 (timestamp 17:30:11, before Lee's appearance), *with id.* at 9:26 (timestamp 17:31:27). As Lee headed for the restroom, an inmate came downstairs with a broom in his hands and set it against the wall by the stairs. *See id.* at 9:30-:38 (timestamp 17:31:31 to :39).

Lee emerged from the restroom area, pausing to look toward the inmates congregating in the back of the common area. *See id.* at 9:59-10:06 (timestamp 17:32:00 to :07). He walked toward the front area, appeared to interact with

someone toward the front (who was standing off camera), and removed his face mask. *See id.* at 10:14-:24 (timestamp 17:32:15 to :24).

Suddenly, someone took a swing at Lee. *See id.* at 10:25 (timestamp 17:32:25). When Lee moved backward, the inmate who allegedly made the gesture toward the picket earlier rushed forward and kicked Lee in the head. *See id.* at 10:26-:27 (timestamp 17:32:27 to :28). Several other inmates joined in, punching Lee, striking him with a broomstick and hitting him with their fists. *See id.* at 10:26-:50 (timestamp 17:32:27 to :50). Lee started partway up the stairs before falling to a seated position. *Id.* at 10:51-:55 (timestamp 17:32:52 to :56). As he rose, an inmate flung liquid at Lee from a dispenser. *Id.* at 10:55-11:03 (timestamp 17:32:55 to 17:33:03). Lee turned toward the picket. *See id.* According to Lee, Brokenberry called for other detention officers ("rovers") to assist. Dkt. 47-3 at 164-65 (citing video at 10:51). This was less than 30 seconds after the attack began.

A few seconds later, a group of inmates, some carrying sticks, ascended the stairs and struck Lee again, prompting him to punch an assailant. Dkt. 47-6 at 11:21-:27 (timestamp 17:33:22 to :28). Lee and his attackers descended to the first floor, where Lee was struck by inmates wielding a mop and the head of a broom. *Id.* at 11:34-:39 (timestamp 17:33:35 to :40). At some point, Lee was stabbed, grabbed a knife that had fallen, and stabbed other inmate(s). *See* Dkt. 47-3 at 165-66.

About 70 seconds after the assault began, a uniformed detention officer arrived, prompting the attackers to disperse. Dkt. 47-6 at 11:36 (timestamp 17:33:37). The officer deployed pepper spray on Lee and at least one attacker. *See* Dkt. 47-3 at 165, 169 (noting detainees were covering their faces due to the pepper spray). About three minutes later, four more detention officers arrived and took two attackers away, one of whom had been stabbed. *See* Dkt. 47-6 at 14:27-:44 (timestamp 17:36:27 to :44); Dkt. 47-3 at 168. Thereafter, Lee was removed from the cell block and taken to a clinic. *See* Dkt. 47-3 at 166-67. According to Lee, the inmates had attacked him because they were "jealous" he had masturbated at Brokenberry. *See id.* at 83-84, 91-92.

Lee sued Brokenberry and Harris County in state court, and the suit was removed to this Court. *See* Dkt. 1. Lee then filed multiple amended pleadings. *See* Dkt. 7, 13, 23. In his third amended complaint, Lee alleged that Brokenberry had explicitly authorized the November 29, 2021 attack, as a basis for both a conspiracy and failure-to-protect claim under 42 U.S.C. § 1983. *See* Dkt. 23 at 3-6. Because of Lee's allegation, which was accepted as true at that early stage, the Court denied Brokenberry's motion to dismiss. *See* Dkt. 38 at 6-13. The Court did, however, dismiss Lee's claims against Harris County as inadequately pleaded. *See id.* at 13-16.

After discovery closed, Brokenberry filed a motion for summary judgment. *See* Dkt. 47 (filed April 15, 2024); *see also* Dkt. 39 (March 15, 2024

discovery deadline). Lee submitted a response that also requested a continuance until Brokenberry could be deposed. *See* Dkt. 49.

Thereafter, the Court issued an order highlighting Lee's key testimony that he lip-read both the inmate's statement asking for permission to "roll" someone and Brokenberry's response. *See* Dkt. 54 at 1-2. The Court expressed concerns that "the record provides an inadequate basis to determine whether Lee possesses the skill to reliably read those individuals' lips." *See id.* at 2. At that point, the Court signaled that it would hold a *Daubert* hearing to address the admissibility of Lee's lip-reading testimony. *See id.* at 4.

Brokenberry then submitted supplemental photographs and video footage showing the cell block where the incident occurred. *See* Dkt. 56. After a status conference, the Court determined that a *Daubert* hearing was unnecessary but authorized Lee to submit a supplement with portions of Brokenberry's recent deposition "that allegedly support [Lee's] assertion that it would have been physically possible for him to read Brokenberry's lips while she was inside the guard area (a/k/a the 'picket[ ]') while he was seated on the top rear bunk in the upstairs cell." Dkt. 60 at 1-2.

Lee submitted his supplement, attaching Brokenberry's deposition. Dkt. 61. Brokenberry filed a response, arguing that Lee's contentions strayed beyond the parameters set in the Court's order allowing supplementation. *See*

Dkt. 62.  As evident from this procedural history, Brokenberry's motion for summary judgment is fully briefed and ripe for resolution.

## Legal Standard

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material if the issue it addresses "could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).

When resolving a motion for summary judgment, courts must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (quotation omitted).  "[T]he court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party …." *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001).  In addition, courts must credit all reasonable inferences from the evidence, without "weigh[ing] evidence or mak[ing] credibility findings." *Seigler v. Wal-*

*Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022).    But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023) (quoting *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003)).

<u>Analysis</u>

## I.    <u>Evidentiary issues</u>

### A.    **Hearsay in witness statements**

In support of her summary-judgment motion, Brokenberry proffers twelve sworn statements made by non-party inmates who were in the cell block when the underlying events occurred.    *See* Dkt. 47-8–47-19 (DX-7–18). Brokenberry maintains that only portions of those statements are admissible, whereas other portions constitute inadmissible hearsay. *See* Dkt. 47 at 14-15, 19, 23, 25, 29-30.  Lee does not address this issue, nor does he rely on any portion of those sworn statements. *See generally* Dkt. 49.  But Brokenberry's submission of the statements warrants resolving what portions may be inadmissible.

Sworn statements or declarations made under penalty of perjury are admissible at the summary judgment stage so long as they are based on personal knowledge, "set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters

13

stated." *See* Fed. R. Civ. P. 56(c)(4); *Nissho-Iwai Corp.*, 845 F.2d 1300, 1306 (5th Cir. 1988) (addressing requirements for unsworn declarations under 28 U.S.C. § 1746). Nevertheless, inadmissible hearsay contained in a sworn statement is "incompetent summary judgment evidence." *See Goodwin v. Johnson*, 132 F.3d 162, 186-87 (5th Cir. 1997) (rejecting hearsay statements in affidavit); *Molina-Torres v. Harris Cnty., Tex.*, 2025 WL 73118, at *5 (S.D. Tex. Jan. 10, 2025) ("An affidavit cannot rest on inadmissible hearsay.").

Brokenberry is correct that the sworn statements from inmates Ricardo Quinones, Antonio Tello, and Christian Rosales contain inadmissible hearsay. Those affiants purport to recount other inmates' assertions that Brokenberry authorized the assault on Lee. *See* Dkt. 47-17 at 3 (Quinones heard from Rosales that Brokenberry "told the inmates, 'I'm about to go home, y'all need to hurry up and do it because I am ready to [go] home'"); Dkt. 47-18 at 3 (Tello "was told by two other inmates [Brokenberry] gave other inmates the 'greenlight' to assault [Lee]"); Dkt. 47-19 at 3 (Rosales heard an inmate (Bobby Johnson) say that Brokenberry "said yes and to hurry up" after the inmate gestured toward her with closed fists). Statements about what the affiants heard from others are classic hearsay that cannot be used to show that Brokenberry gave permission for the assault to occur. *See* Fed. R. Evid. 801(c); *see also, e.g.*, *Uzoh v. Walmart Assocs., Inc.*, 2024 WL 4919642, at *3 (W.D. Tex.

14

Oct. 21, 2024) (deeming inadmissible statement about what affiant was told, out-of-court, by someone else).  The hearsay statements are therefore excluded.

### B.    Lee's "lip reading" assertions

Two key allegations in this case depend entirely on Lee's testimony (1) that an unnamed inmate asked Brokenberry "do you want me to roll him," accompanied by a hand-rolling gesture and (2) that Brokenberry responded in the affirmative, stating "Hurry up, I am fixing to get off work."  *See* Dkt. 47-1 at 3.  Yet Lee's own testimony concedes that he did not hear either of those statements.  *See id.*; Dkt. 47-3 at 95-96.  Instead, Lee claims that he read the other inmate's and Brokenberry's lips.  *See* Dkt. 47-1 at 3; Dkt. 47-3 at 54, 96.

During his deposition, however, Lee equivocated as to whether he possessed the requisite skill to read someone's lips.  *Compare* Dkt. 47-3 at 54 (answering "Yes" when asked if he had a skill in reading lips), *with id.* at 96 (testifying that lip reading "ain't my skill" and "It's not my skill").  Moreover, video footage confirmed that Lee was seated on the top bunk in the right-hand corner of the cell, well away from the inmate whom he claims had spoken to Brokenberry, and much farther away from Brokenberry's position in the picket, when the alleged exchange occurred (at about 5:22 p.m.).  *Compare* Dkt. 47-4 at 16:02-:53 (DX-4, second floor video), *and* Dkt. 47-21 at 1:47:18 (DX-19A, Lee's deposition video), *with* Dkt. 47-6 at 00:46-52 (DX-5A, first floor video); *see also* Dkt. 47-3 at 140-41.

That evidence raised questions about the admissibility of Lee's lip-reading testimony, which this Court posed *sua sponte*. *See* Dkt. 54 at 3-4; *see also Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) (district court may exclude improper summary judgment evidence *sua sponte*). In an analogous Section 1983 case, the Third Circuit flagged a similar issue. *See Manasco v. Rogers*, 337 F. App'x 145, 151 (3d Cir. 2009). There, a plaintiff maintained that he "lip-read" a statement that the defendant, a detention officer, had instructed other officers to give the plaintiff nothing after the plaintiff's clothing was soiled, which raised fact questions as to whether the defendant was entitled to qualified immunity for violating the plaintiff's right to adequate hygiene and sanitation. *See id.* But the Third Circuit emphasized "that the admissibility of the 'lip-read statement' is a legal issue that must be resolved." *See id.* It was for the district court to determine, on remand, "whether there is any foundation at all for [plaintiff's] claim that he has the ability to read lips and hence [he] is competent to testify as to the meaning of lip movements he claims to have observed." *Id.*

Whether viewed through the lens for evaluating expert testimony under *Daubert*, or even for admitting lay testimony, Lee has proffered an insufficient basis to admit his lip-reading opinions.[2] To proffer expert testimony, the

---

[2] The Court need not determine whether lip-reading demands expert testimony or can be supported by lay opinions.

proponent must prove that the expert is qualified, by virtue of his knowledge, skill, experience, training, or education, to testify within a specific field or on a particular subject. *See United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009); Fed. R. Evid. 702 (proponent's burden of proof). And even if the expert has the requisite qualifications, his opinions must rest on a reliable foundation and be relevant to the issues. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Opinions from lay witnesses must be "rationally based on the witness's perception." Fed. R. Evid. 701(a). To be admissible, however, a lay opinion requires an adequate foundation. *See* Victor J. Gold, 29 Fed. Prac. & Proc. Evid. § 6254 & nn.52, 53 (2d ed.) (collecting authorities). "[V]ague, general statements about the basis for lay opinion are insufficient." *Id.* "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 ... because there is no way for the court to assess whether it is rationally based on the witness's perceptions." *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (quotation omitted). Moreover, "where the lay witness observes matters that can be comprehended only with specialized experience, it may be necessary to demonstrate that the witness has such experience." *Francois v.*

*Gen. Health Sys.*, 459 F. Supp. 3d 710, 725 (E.D. La. 2020) (quoting 29 Fed. Prac. & Proc. § 6254).

Lip reading, quite evidently, requires at least some specialized skill. But even during his deposition, Lee gave inconsistent signals as to whether he possesses lip-reading abilities. *Compare* Dkt. 47-3 at 54, *with id.* at 96. Regardless, the video footage and Brokenberry's supplemental photographs, *see* Dkt. 56-1 at 5-22 (photos of both levels of the cell block and from inside the picket), fatally undermine the notion that Lee could have read each speaker's lips. The inmate was turned sideways on the staircase toward the picket—not facing Lee—and standing an appreciable distance away from Lee's position atop the rearmost second floor bunk. Moreover, uncontroverted evidence shows that there are only limited angles at which an inmate can see through a sliver at the top of the picket's glass, to the adjoining cell block. *See* Dkt. 61-12 at 46. Inmates cannot see officers within the picket due to the mirrored glass, the lights being off inside, and the officer being seated at a desk surrounded by screens.[3]  *See id.* (Brokenberry's testimony explaining these facts); *see also* Dkt. 56-1 at 5-13 (photos inside and outside the picket).

---

[3] Contrary to Lee's contentions, Dkt. 61 at 11-12, Brokenberry clearly distinguished between an inmate's ability to see through a small sliver of glass at the top of the picket, to the adjoining cell block, and an inmate's *inability* to see her within the picket itself.

18

Viewed in *Daubert*'s terms, Lee has not shown that he has both the expertise and a reliable basis to opine that the other inmate or Brokenberry said what Lee claims. And even under the framework for lay testimony, Lee has not proffered an adequate foundation for his opinions about what each speaker's lip movements meant. He has not sufficiently demonstrated that he has any lip-reading expertise, generally, or could have read the speakers' lips in this instance, given where the speakers were located relative to his position on the second-floor bunk, the picket's mirrored glass, and Brokenberry's position within that picket. Accordingly, Lee's assertions that the inmate asked for permission to attack Lee, and that Brokenberry authorized it, are inadmissible and therefore excluded.

## II.   <u>Summary judgment motion</u>

As Brokenberry maintains, the exclusion of inadmissible hearsay and lip-reading opinions leaves Lee unable to raise a genuine issue of material fact on either his conspiracy or failure-to-protect claims under Section 1983. *See* Dkt. 47 at 24-25, 29-30 (Brokenberry's motion for summary judgment); *see also* Dkt. 53 at 4-6 (Brokenberry's reply). The Court agrees.

### A.    **Lee's request for a continuance is moot.**

After Brokenberry initially filed her summary-judgment motion, Lee sought a continuance of the motion, citing his need to depose Brokenberry. *See* Dkt. 49. Later, however, Lee submitted a supplement with Brokenberry's

deposition.[4]    *See* Dkt. 61 (Lee's supplement); Dkt. 61-12 (Brokenberry's deposition).  Lee's request for a continuance is therefore denied as moot.

### B.    Conspiracy claim

Lee's lack of admissible evidence that Brokenberry authorized an inmate to mount the attack defeats his claim that Brokenberry conspired with an inmate to violate Lee's due process rights.  *See* Dkt. 23 at 5-6 (alleging conspiracy under § 1983); *see also* Dkt. 61 at 7 (Lee relying on his lip-reading testimony to substantiate a conspiracy).  For this type of claim, a plaintiff must show an agreement between at least one state actor and a private citizen to deprive the plaintiff of a constitutional right.  *See Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) (requiring an agreement to commit an illegal act); *Abdeljalil v. City of Ft. Worth*, 55 F. Supp. 2d 614, 622 (N.D. Tex. 1999) (stating requirements for Section 1983 conspiracy).

The record contains no admissible evidence that Brokenberry agreed with or authorized an inmate's request to attack Lee.  There is no evidence that any such request was made, nor that Brokenberry agreed to allow it.  Accordingly, Brokenberry is entitled to summary judgment on Lee's conspiracy claim.

---

[4] Brokenberry moved to strike Lee's supplemental brief that attempted to bolster his prior summary-judgment arguments with new contentions.  *See* Dkt. 62 at 1-3.  The Court's resolution of the merits renders it unnecessary to address Brokenberry's procedural challenge.

**C.     Failure-to-protect claim**

1.     <u>The record fails to show that Brokenberry was deliberately indifferent to a substantial risk of serious harm to Lee.</u>

Lee's contention that Brokenberry violated his constitutional rights by failing to protect him from the attack fares no better.  He fails to raise a genuine issue of material fact on this Section 1983 claim.

Like the Eighth Amendment, which applies only to convicted prisoners, the Due Process Clause confers upon pre-trial detainees a constitutional right to "basic human needs, including medical care and protection from harm, during their confinement." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) ("*Hare II*")); *see also, e.g.*, *Brown v. Harris Cnty., Tex.*, 2010 WL 774138, at *5 (S.D. Tex. Mar. 2, 2010) (explaining Eighth Amendment and Due Process protections).  This duty requires prison officials "to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)).

"Prison officials are not, however, expected to prevent all inmate-on-inmate violence." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) (citing *Farmer*, 511 U.S. at 834).  Those officials "can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm." *Id.*

"Deliberate indifference is an extremely high standard to meet." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)).  It is not enough to show a negligent or even grossly negligent response to a substantial risk of serious harm.  *See Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020) (quoting *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020)); *see also Adames*, 33 F.3d at 514 (reversing jury verdict where, "[a]t best," the plaintiff showed that a warden "was negligent for failing to infer that inmates at the McConnell Unit were in danger").

To constitute deliberate indifference, (1) "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) '[s]he must also draw the inference.'" *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer*, 511 U.S. at 837).  Conversely, prison officials will not be liable for a failure to protect if (1) "they were unaware even of an obvious risk to inmate health or safety," (2) "they did not know of the underlying facts indicating a sufficiently substantial danger," (3) "they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or (4) they "knew of a substantial risk to inmate health or safety ... [and] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844-45.

Lee testified that he complained to Brokenberry about fearing for his safety when he arrived at the cell block. *See* Dkt. 47-3 at 37. This complaint, which lacks specifics, is insufficient to show either that Lee faced a substantial risk of serious harm, or that Brokenberry was deliberately indifferent to Lee's safety. *See, e.g.*, *Armstrong v. Price*, 190 F. App'x 350, 353 (5th Cir. 2006) (per curiam) (multiple complaints of vague threats by unnamed inmates were insufficient); *Hicks v. Ashworth*, 2024 WL 3243474, at *5, 7 (S.D. Tex. June 26, 2024) (concluding plaintiff's allegations that he "told the defendants that he believed his life was in danger [were] insufficient to show that any of the defendants were aware of facts from which they could infer that [he] faced a substantial risk of serious harm"); *Adams v. Collier*, 2022 WL 456535, at *6-7 (E.D. Tex. Jan. 19, 2022) (inmate's fear of being attacked due to a fight with someone else a month earlier did not put officials on notice that the inmate faced a substantial risk of serious harm), *adopted by* 2022 WL 446748 (E.D. Tex. Feb. 14, 2022).

Lee also appears to blame Brokenberry for directing him, over the intercom, to stop masturbating. *See* Dkt. 61 at 5-7 (complaining that Brokenberry "put other prisoners on notice that Plaintiff was engaging in personal sexual activities"). But Lee admitted that he did not know the other inmates. *See* Dkt. 47-3 at 75 (Lee's testimony that "I don't know nobody in there"). Nor is there any indication that the inmates had previously assaulted

others for masturbating.  Moreover, apart from Lee's baseless speculation that other inmates would be "jealous" of his actions, *see* Dkt. 47-3 at 83-84—which is not evidence—Lee offers nothing indicating that Brokenberry knew or believed her announcement would incite violence against him or that doing so would create a substantial risk of serious harm.  *Cf. Reaux v. Strain*, 2011 WL 3475397, at *7 (E.D. La. Aug. 9, 2011) (rejecting assertion that detention official was liable for an attack that occurred after the official told inmates that plaintiff was a former correction officer; plaintiff had no prior problems with the inmates who attacked him).

Lee also maintains that the actions of other inmates, including the gesture by the inmate on the stairs, presaged the attack.  Yet there is no evidence that Brokenberry saw the inmate's gesture, nor that she would have or did construe it as a request to attack Lee even if she had seen it.

Lee's attempt to cast the inmates' ensuing activities as nefarious— whether they involved going up and down the stairs, moving or playing with brooms or mops, grabbing towels, putting on shoes or shirts, or messing with a hot water device—is tainted by hindsight.  *See, e.g.*, Dkt. 47-3 at 66 (Lee's assertions that inmates donned towels and masks because "they fixing to stab me.  They fixing to hit me with boiling water.  They're fixing to hit me with brooms"), 68 (Lee's assertions that the inmates' conduct shows that they were going to beat him up), 138 (Lee asserting that two inmates walking were

"plotting"), 140-42 (claiming that inmates downstairs were about to "roll somebody"), 147-49 (alleging that an inmate was "Talibanning" by "putting his little mask on"), 151-52 (claiming that inmate playing with a broom was "fixing to beat my ass with that pole"), 156-57 (asserting that inmate was "checking" if the "boiler" or "hot pot" was hot); *see also* Dkt. 50-4 at 2 (Lee's affidavit claiming that inmates "began 'lacing up', 'masking up', putting on protective gear, heating water, gathering weapons, and otherwise preparing for an assault"). "Deliberate indifference," however, "must be viewed from [Brokenberry's] perspective at the time in question, not with hindsight's perfect vision." *Pratt v. Deville*, 2016 WL 1602948, at *6 (W.D. La. Feb. 23, 2016) (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)).  In reality, the video footage preceding the attack shows inmates engaging in unremarkable activities, certainly nothing so obviously indicative of an impending act that a factfinder could infer that Brokenberry knew of and recklessly disregarded that possibility. *See Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997) (requiring "subjective recklessness" as the test for deliberate indifference) (citing *Farmer*, 511 U.S. at 838-40).

Thus, even assuming that Brokenberry saw the pre-attack actions depicted on the video footage, there is no evidence that their actions signaled a substantial risk of serious harm to anyone, generally—much less Lee, specifically.  Nor is there evidence that Brokenberry believed that the inmates

posed a serious threat to Lee, such that she could have been deliberately indifferent for failing to respond to any such threat. Nothing in the record indicates that the inmates involved in the attack had ever harmed or attempted to harm a fellow inmate, or that Brokenberry knew of any such history. As already noted, Lee did not know those inmates. *See* Dkt. 47-3 at 75. Merely arguing that some of the inmates' conduct should have aroused suspicion is not enough to render Brokenberry liable. *See Torres*, 972 F.3d at 663 ("Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.") (quoting *Banks*, 956 F.3d at 811).

It is also undisputed that Brokenberry called for assistance after the attack began, which prompted an officer (called a "rover") to arrive in the cellblock within 70 seconds.[5] *Compare* Dkt. 47-6 at 10:24 (start of the attack), *with id.* at 11:35 (rover appears); *see also* Dkt. 61-12 at 30, 34 (Brokenberry's testimony that she called for a rover when she saw Lee lose his footing after the fight appeared on the camera footage she was watching). She could not leave the picket because that would permit an inmate to enter, open the doors,

---

[5] The evidence fails to show that Brokenberry saw the beginning of the attack. At the time, she was watching footage on-screen both from Lee's cellblock and the adjoining one. *See* Dkt. 61-12 at 18. Her uncontroverted testimony reflects that there are blind spots where movements in the cellblock are not caught on camera. *See id.* at 29, 34.

and release everyone from the cellblock. *See* Dkt. 61-12 at 34. Brokenberry therefore took the only appropriate action she could take when realizing that Lee was being assaulted.

In sum, Lee presented no admissible evidence that Brokenberry was deliberately indifferent to a substantial risk of serious harm posed by the inmates who assaulted him. Summary judgment is therefore warranted on his Section 1983 claim.

### 2.   Brokenberry is also entitled to qualified immunity.

As a further impediment, Lee cannot overcome Brokenberry's qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). There are two steps to the qualified immunity inquiry, which courts can address in any order. *See id.* at 236. First, courts determine "whether the facts, [t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]" *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (quotation omitted). To satisfy this requirement, it must be shown that the official's actions were objectively unreasonable. The official's actions "must be judged in light of the circumstances that confronted [her] and the facts that

were available to [her], without the benefit of hindsight." *Howe v. Officer John Doe #1*, 2017 WL 4676830, at *2 (S.D. Tex. Oct. 13, 2017) (collecting authorities).

Second, the court evaluates "whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Once qualified immunity has been invoked, the plaintiff bears the burden to "rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).

As the analysis above reflects, there is no evidence that Brokenberry's conduct violated any clearly established right or was objectively unreasonable. Lee's general concern about fearing for his safety was too vague to alert Brokenberry that he faced a substantial risk of serious harm. Likewise, no evidence suggests that Brokenberry knew her order directing Lee to stop masturbating would precipitate an attack. There is also no admissible evidence that Brokenberry saw the inmate's gesture that supposedly indicated

an intent to begin an attack. Even if she saw the ensuing activities of other inmates, nothing indicates that Brokenberry concluded or recklessly disregarded an obvious likelihood that Lee would be attacked. And Brokenberry acted properly by remaining in the picket and promptly calling for assistance once she saw the attack.

As a result, Lee has failed to meet his burden to overcome Brokenberry's qualified immunity. For this additional reason, summary judgment is warranted on Lee's failure-to-protect claim.

## <u>Conclusion</u>

For the foregoing reasons, it is **ORDERED** that Defendant Olivia Brokenberry's motion for summary judgment (Dkt. 47) is **GRANTED**.

Signed on March 19, 2025, at Houston, Texas.

_____

Yvonne Y. Ho
United States Magistrate Judge